Filed 9/30/22 In re I.Q. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re I.Q., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE, <br><br>     Plaintiff and Respondent, <br><br> v. <br><br> I.Q., <br><br>     Defendant and Appellant. | E078374 <br><br> (Super.Ct.No. J281478) <br><br> OPINION |

APPEAL from the Superior Court of San Bernardino County. Charles J. Umeda, Judge. Affirmed.

Cynthia M. Jones, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Laura Bagget and Robin Urbanski, Deputy Attorneys General, for Plaintiff and Respondent.

1

Pursuant to Welfare and Institutions Code[1] section 801, subdivision (a), defendant and appellant I.Q. (minor) appeals from an order transferring the matter from juvenile to adult criminal court. For the reasons set forth *post*, we affirm the court's order.

## FACTUAL AND PROCEDURAL HISTORY

### A. PROCEDURAL HISTORY

On June 24, 2019, a wardship petition under Welfare and Institutions Code section 602, subdivision (a), alleged that minor committed misdemeanor vandalism under Penal Code section 594, subdivision (b)(2)(A) (count 1); misdemeanor criminal threats under Penal Code section 422, subdivision (a) (count 2); and misdemeanor battery on school property under Penal Code section 243.2, subdivision (a)(1) (count 3). On July 22, 2019, minor entered into a stipulated agreement for informal probation under Welfare and Institutions Code section 654.2.

On September 24, 2019, a first amended wardship petition added count 4, carrying a concealed firearm under Penal Code section 25400; count 5, possession of a firearm by a minor under Penal Code section 29610; and count 6, receiving stolen property, a handgun, under Penal Code section 496, subdivision (b). On October 10, 2019, minor admitted count 4 (carrying a concealed firearm), and the juvenile court placed him on formal probation. The People dismissed the remaining counts.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

On August 11, 2020, a subsequent wardship petition alleged that minor committed one count of felony vandalism under Penal Code 594, subdivision (b)(1). Minor failed to appear on this petition several times. On February 3, 2021, minor was arrested. At the time of his arrest, minor was the passenger in a car that had been involved in a car-to-car shooting where the driver of minor's car died. As to his wardship petition, on February 5, 2021, minor admitted the allegation as a misdemeanor and the juvenile court placed him on formal probation.

On May 13, 2021, another subsequent wardship petition, the current matter, charged minor with one count of murder under Penal Code section 187, subdivision (a) (count 1). The petition also alleged that (1) minor personally and intentionally discharged a firearm under Penal Code section 12022.53, subdivisions (d), and (e)(1); and (2) the offense was committed for the benefit of, at the direction of, and in association with a criminal street gang under Penal Code section 186.22, subdivision (b)(1)(C).

In the petition, the People requested a transfer hearing to determine whether minor should be transferred to a court of criminal jurisdiction pursuant to section 707, subdivision (a)(1). The transfer hearing commenced on December 13, 2021. On January 4, 2022, the juvenile court ordered the matter transferred to adult criminal court.

On January 14, 2022, minor filed a timely notice of appeal.

B.    FACTUAL HISTORY

On April 27, 2021, minor and two friends were in a parked van; they were all juveniles. Isaac R. was in the driver's seat, Christopher R. was in the rear passenger seat,

3

and minor was in the front passenger seat. Minor and Christopher were both members of the 10th Street Mellow Mafia Bloods criminal street gang. They, however, were not engaged in a gang activity that evening. They were in the neighborhood to meet some girls; they parked their van to wait for the girls to finish getting ready.

After seeing the van parked outside, the fiancé of the victim called the police to report that they suspected people were stealing catalytic converters.

After watching the van for approximately 10 minutes, the victim got into his vehicle and drove past the van. The victim stared at the minors as he slowly drove past them. Minor described the victim as an adult Mexican who was "all tatted up." A subsequent toxicology report indicated that the victim had a high level of methamphetamine in his system.

After the victim drove by, minor told Isaac to drive away. The victim proceeded to follow the van.

The victim followed the van for about 30 minutes—from Rialto to San Bernardino. The vehicles travelled on and off the freeway, with speeds up to 120 miles an hour at times. Minor called another Mellow Mafia member, Exaviear Bradford.[2] Isaac heard minor tell Bradford that they were being followed so they were going to shoot at the vehicle. Minor directed Isaac to go to a particular intersection. When they first arrived at the intersection, Bradford was not there. Minor told Isaac to drive away then return to the intersection. When they returned, Bradford was at the intersection.

[2] Exaviear is also referred to in the record as Xavier.

4

There, both minor and Bradford started to shoot at the victim's vehicle; minor shot from the van and Bradford shot from the sidewalk at the intersection.

One of the shots hit the victim in the heart and killed him. There were 11 bullet strikes to the victim's vehicle as follows: six bullet strikes to the hood, three to the left front quarter panel, one to the left headlight, and one to the lower left portion of the windshield.

After the shooting, minor told Isaac to drive to a residence, which was later determined to be minor's residence. When they arrived, minor collected Bradford's gun, left the van, and approached the house through an alleyway. Minor then returned to the van without any guns.[3] They went to Isaac's residence. Thereafter, minor left with Bradford and Christopher in Christopher's vehicle.

When law enforcement searched minor's residence, they found a .22-caliber handgun and methamphetamine. The weapons used in the murder were not found. The victim was not armed with a firearm and there was no gun in his vehicle. After the murder, minor left San Bernardino and went to Arizona.

Minor, Bradford, and Christopher were all members of the 10th Street Mellow Mafia Bloods; Bradford was the leader.

Minor had an Instagram account. The account contained numerous messages related to guns and gun sales. The day after the shooting, minor posted the following on his account: "IM fin go down for murder."

---

[3] Bradford told a detective that he threw his gun into a field.

5

About three months prior to the shooting, minor had been in a similar situation where his friend Leonardo had been shot. Leonardo had picked up minor to go for a ride in Leonardo's new car; a car followed them, then pulled up next to them at a red light. A person in the back of the car started shooting at minor and Leonardo. One of the shots hit Leonardo in the head. Minor stayed with Leonardo until paramedics arrived. The responding officers arrested minor at the scene for a probation violation.

**DISCUSSION**

Minor contends that the juvenile court erred in finding him unsuitable for juvenile court based on his criminal sophistication because the court failed to take into account minor's youth, childhood trauma, and diagnosis of post-traumatic stress disorder (PTSD). Moreover, minor contends that the court erred by failing to appropriately factor into its assessment the gravity of the offense, the victim's behavior prior to the shooting, and the evidence suggesting that minor acted in the heat of passion in response to the victim's aggressive conduct. For the reasons set forth *post*, we find that the juvenile court did not abuse its discretion in ordering minor to adult criminal court.

A.   LEGAL BACKGROUND

Under section 707, a minor may only be tried as an adult if the juvenile court finds the minor is unfit for juvenile treatment and orders the minor transferred to adult criminal court. Section 707, subdivision (a)(3), sets forth five criteria for the juvenile court to consider in deciding whether a minor is unfit for juvenile treatment. The five criteria are: (1) "The degree of criminal sophistication exhibited by the minor"; (2) "Whether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction";

6

(3) "The minor's previous delinquent history"; (4) "Success of previous attempts by the juvenile court to rehabilitate the minor"; and (5) "The circumstances and gravity of the offense alleged in the petition to have been committed by the minor." (§ 707, subd. (a)(3)(A)-(E).)

## B. PROCEDURAL BACKGROUND

In this case, Probation Officer Castro prepared a section 707, subdivision (a), report. Prior to preparing the report, Officer Castro was minor's probation officer for over a year. The officer knew minor to be a member of the 10th Street Mellow Mafia Bloods criminal street gang based on his associates, social media posts, and a tattoo on his face paying homage to a fallen gang member. With respect to the first factor when considering a transfer request under section 707, subdivision (a), a court must evaluate the degree of criminal sophistication exhibited by the minor. In his report, Officer Castro found significant evidence showing that, not only was minor a gang member, he also had access to firearms and had a history of being in possession of firearms. Moreover, the officer found the evidence, showing that minor concealed his firearm after the murder to avoid detection, to be relevant.

In considering the degree of criminal sophistication of the offense in this case, Officer Castro considered the offense sophisticated because, instead of trying to escape while minor and his friends were being followed by the victim, minor called another gang member, who was allegedly a leader of the gang, to seek support. After the phone call, in a coordinated effort, both minor and Bradford participated in shooting the victim's vehicle at the same time. The officer described it as an ambush shooting in which the

7

gang members lured the victim into an open area and then fired from multiple directions. As to the second, third, and fourth factors—whether minor could be rehabilitated prior to the expiration of the juvenile court's jurisdiction, the juvenile's previous delinquent history, and the success of previous attempts to rehabilitate the juvenile—Officer Castro concluded that minor could not be rehabilitated before the expiration of juvenile court jurisdiction. In reaching this conclusion, the probation officer considered minor's history of criminal delinquency, and the fact that minor had failed numerous times on probation by failing to report, provide his address, and participate in rehabilitative classes. The probation officer stated that minor's prior delinquent history rendered him unfit for treatment in the juvenile system. Although the probation officer stated that minor did not demonstrate a desire to participate in rehabilitative programs, the officer acknowledged that there were rehabilitative programs from which minor could benefit and found minor suitable under the fourth factor. With respect to the fifth factor, the gravity of the offense, Officer Castro concluded that minor was not suitable for the juvenile justice system based on the sophistication of the offense, minor's possession of guns, and minor's participation in a gang.

The parties stipulated to Dr. Marjorie Graham-Howard's qualifications to testify as an expert witness on behalf of minor. Dr. Graham-Howard prepared a psychological evaluation of minor. She reviewed the police reports associated with his case, but she did not review the probation reports.

While Dr. Graham-Howard was interviewing minor, he discussed his family history. Minor stated that he grew up in a home with domestic violence, primarily

8

consisting of his father abusing his mother. When minor tried to intervene, his father would hit him, too. Minor also told the doctor that both his parents used drugs, and his father had a criminal history. Minor's parents separated when he was eight years old; he is now mostly estranged from his father.

Minor described having behavioral issues in school. Minor was diagnosed with ADHD in the fourth grade. Moreover, he had been suspended repeatedly and was failing his classes. Minor also told Dr. Graham-Howard that most of his friends were delinquent, either criminally or behaviorally. Minor admitted that he was a member of a gang. He reported using marijuana and prescription medication. Furthermore, although minor had no treatment history for mental health issues, the doctor noted that minor "endorsed a number of depressive- and anxiety-related symptoms" during the evaluation. Dr. Graham-Howard suspected that minor might be experiencing PTSD from witnessing domestic violence as a child, and from the prior incident where he witnessed his friend die in a shooting. Dr. Graham-Howard testified that minor's full scale IQ score fell within the average intellectual functioning range. In terms of his risk for recidivism, minor scored in the high-risk category. Dr. Graham-Howard explained that a portion of that score was based on historical facts about minor that would never change, like his exposure to violence in his home. She, however, noted that treatment has been shown to reduce recidivism. Dr. Graham-Howard diagnosed minor with major depression, PTSD, conduct disorder with adolescent onset, and cannabis-use disorder.

As for the section 707, subdivision (a), criteria, Dr. Graham-Howard found minor to be criminally sophisticated based on his gang affiliation and "poor behavior across

9

multiple settings." She also found the crime in this case to be criminally sophisticated given the information that weapons were involved, there were coparticipants, and an effort to conceal evidence. As to the second factor, Dr. Graham-Howard believed minor could be rehabilitated by the time he was 25 years old. As to the third factor, the doctor opined that minor had a noteworthy history of criminal delinquency. Nonetheless, she qualified that it was "not beyond the bounds of what [she] think[s] is appropriate for youth who [are] retained in the juvenile justice system." As to the fourth factor, Dr. Graham-Howard observed that minor had not done well on probation. She, however, further explained that minor had not received treatment for his mental illness, so she was not ready to give up on rehabilitative measures for minor. As to the fifth factor, minor having "a gun in his hand" counted as an aggravating factor. The doctor found the fact that the victim had been chasing minor, in addition to minor's mental health issues and family history, as mitigating factors that could have contributed to minor's state of mind at the time of the murder. Dr. Graham-Howard opined, based on her assessment of these factors, that minor could remain in the juvenile justice system without being transferred to adult court.

Beth Henry, a retired probation offer who now prepared "mitigation reports," testified on behalf of minor. Henry prepared a mitigation report on behalf of minor. While working on the report, Henry learned many of the same things Dr. Graham-Howard learned, which included (1) minor's mother's history of drug abuse; (2) minor's father's criminal history; (3) minor's parents' volatile relationship, which included domestic violence; (4) minor's poor academic performance in school; (5) minor

10

witnessing the death of his friend while the two of them were sitting in the car together; and (6) minor being a gang member and using drugs and alcohol. Minor told Henry that he regretted what happened; he did not want anyone to die. Although minor did not do well on juvenile probation, Henry opined there were programs associated with the juvenile probation system that could benefit minor.

Probation Officer Todd Holmes testified on minor's behalf. Officer Holmes opined that minor would benefit from gang counseling, school, and other programs available to juveniles.

After the testimonies and evidence were presented to the court, the court made its determinations as follows.

As to the first factor under section 707, subdivision (a)—the degree of criminal sophistication—the court referenced Dr. Graham-Howard's evaluation, which provided that minor was of average intelligence but also met the criteria for diagnoses of depression and PTSD. The court, however, determined that those factors did not mitigate the criminal sophistication minor exhibited in executing the murder. The court noted minor's actions following the murder, mainly his posts and messages on his social media account, showed he appreciated the risks and consequences of his criminal actions. Minor also had access to firearms via the transactions he conducted on social media and even sold firearms while on probation. In fact, minor committed the offense with a semiautomatic firearm. Moreover, the court took note that minor was a member of a criminal street gang. While minor and his cohorts were being followed by the victim, minor called Bradford, a fellow gang member, to arrange a meeting place. Minor

11

directed Isaac to drive to the location where Bradford and minor agreed to meet. At that location, both minor and Bradford simultaneously fired at the victim's vehicle. After the shooting, minor told Isaac to drive to minor's residence where minor proceeded to conceal the weapons used in the crime. Furthermore, the court noted that both Dr. Graham-Howard and Officer Castro agreed both minor and the offense were criminally sophisticated. Accordingly, with respect to the first factor, the court concluded minor "exhibited a very high level of criminal sophistication." Therefore, minor was not suitable for juvenile court.

As to the second factor under section 707—whether defendant could be rehabilitated prior to the expiration of juvenile court jurisdiction—the juvenile court noted that minor was 17 years old at the time of the hearing; therefore, eight years of juvenile court jurisdiction remained. The court observed that the parties had not presented much information as to what counseling and treatment minor might undergo if he remained in the juvenile justice system. The court again referenced information that showed minor was heavily involved in his gang, and minor's sale and possession of firearms while on formal probation. The court also noted that prior to the murder at issue, minor had witnessed the murder of his friend Leonardo, a fellow gang member, but was not deterred from continuing with his gang lifestyle. Moreover, the court found it important that minor called another gang member immediately prior to the shooting in order to coordinate the ambush of the victim. The court then recognized that there were treatment programs available that could provide minor an opportunity for rehabilitation. In fact, minor had completed several programs while in juvenile hall. Additionally, the

12

court acknowledged that although minor had exhibited a pattern of disobeying and disrespecting staff, his behavior summaries indicated his behavior had improved over the course of time. Furthermore, minor generally exhibited good behavior with his peers in juvenile hall, with the exception of being cited for fighting on two occasions. The court then concluded that the prosecution had failed to meet its burden with respect to showing what programs were available to minor and whether the programs would serve to rehabilitate him. No evidence was admitted to suggest minor was unlikely to be rehabilitated by the programs. Therefore, the court found minor suitable for juvenile court under the second factor.

As to the third factor—minor's prior delinquency history—the court recounted minor's delinquency hearing discussed, *ante*. The court summarized minor's pattern of criminal behavior over a three-year span with the most serious offense, prior to the charged murder, being possession of a firearm. The court noted that other juveniles with similar histories, who were also members of gangs, had been found suitable for juvenile court. As such, the court found minor suitable for juvenile court under the third factor.

As to the fourth factor—the success of previous attempts by the juvenile justice system to rehabilitate minor—the court again discussed minor's history of delinquent behavior. The court stated that prior attempts at rehabilitating minor on probation had been unsuccessful. The court, therefore, concluded minor was not suitable for juvenile court under the fourth factor.

Finally, as to the fifth factor—the gravity of the offense—the court noted that the gravity of the murder charge was not in dispute. All the witnesses at the transfer hearing

13

agreed on that point. The court then reiterated that minor coordinated with a fellow gang member by calling him and discussing where to meet in order to lure the victim, and the two of them fired numerous rounds at the victim's vehicle at the same time. The court acknowledged the evidence that the victim had been pursuing minor and his cohorts at high speed prior to the shooting. The court found that fact relevant to minor's state of mind at the time of the shooting. The court went on to express that a trier of fact could conclude the victim's conduct created fear in minor, but also noted that a trier of fact could conclude minor did not perceive the incident as being so imminent that the only solution was to lure the victim to the area where the fellow gang member, who was armed, would also join them. The court ultimately concluded that the victim's behavior did not mitigate the seriousness of the offense, and found minor not suitable for juvenile court under the fifth factor.

At the conclusion of the hearing, based on the totality of the circumstances, the court ruled that minor was not suitable "to be dealt with within the juvenile court" and ordered the matter transferred to adult criminal court.

C.     STANDARD OF REVIEW

On appeal, we review a juvenile court's order on a motion to transfer for abuse of discretion. (*Kevin P. v. Superior Court of Contra Costa County* (2020) 57 Cal.App.5th 173, 187.) The court's "findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious." (*J.N. v. Superior Court* (2018) 23 Cal.App.5th 706, 715 (*J.N.*).) "The standard is deferential: 'When a trial court's factual

14

determination is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court begins and ends with the determination as to whether, on the entire record, there is substantial evidence, contradicted or uncontradicted, which will support the determination.' " (*People v. Jones* (1998) 18 Cal.4th 667, 681, fn. omitted (*Jones*).)

"To justify the transfer of a minor from juvenile court to the criminal court system, the prosecution bears the burden of establishing by a preponderance of the evidence the minor is not a suitable candidate for treatment under the juvenile court system." (*J.N.*, *supra*, 23 Cal.App.5th at p. 715.)

Moreover, the weight to be given to each of the five factors under section 707 is within the court's discretion. (*D.W. v. Superior Court* (2019) 43 Cal.App.5th 109, 116.) "Nothing in section 707 indicates that the . . . court [is] required to give equal weight to each of the five criteria or that it would necessarily be an abuse of discretion to find that one criterion outweighed the other criteria." (*C.S. v. Superior Court* (2018) 29 Cal.App.5th 1009, 1035.)

D.    ANALYSIS

Minor contends that "the juvenile court erred in holding minor was unfit for juvenile court based on his criminal sophistication and the gravity of the offense."[4] We disagree with minor's contention, as set forth in detail *post*.

---

[4] Minor does not challenge the court's holding that minor's previous attempts at rehabilitation had not been successful.

On January 4, 2022, after acknowledging its adherence to the law and standard of review, and acknowledging that it had considered the testimonies and relevant evidence presented, the juvenile court granted the People's request to transfer minor's case to adult criminal court. The court acknowledged that the People had the burden of proof; the standard was preponderance of the evidence.

1. *MINOR EXHIBITED A DEGREE OF CRIMINAL SOPHISTICATION*

Minor contends that the court erred in finding that he exhibited a degree of criminal sophistication that weighed in favor of granting the motion to transfer. He argues the court erred by failing to consider whether his criminal sophistication was mitigated by his youth, upbringing, and PTSD. However, as discussed in detail *ante*, the record shows that the juvenile court considered minor's mitigating factors.

"The criminal-sophistication criterion 'requires a juvenile court . . . to consider the whole picture, that is, all the evidence that might bear on the minor's criminal sophistication, including any criminal sophistication manifested in the present crime.' " (*Kevin P. v. Superior Court of Contra Costa County*, *supra*, 57 Cal.App.5th at p. 192, quoting *Jones*, *supra*, 18 Cal.4th at pp. 683-684.) In evaluating this factor, the "court may give weight to any relevant factor, including, but not limited to, the minor's age, maturity, intellectual capacity, and physical, mental, and emotional health at the time of the alleged offense, the minor's impetuosity or failure to appreciate risks and consequences of criminal behavior, the effect of familial, adult, or peer pressure on the

16

minor's actions, and the effect of the minor's family and community environment and childhood trauma on the minor's criminal sophistication." (§ 707, subd. (a)(3)(A)(ii).)

In this case, the court, in explaining its reasoning behind its finding, noted that it had considered the testimonies presented at the hearing, the arguments of counsel, as well as the reports submitted by the probation officer, Dr. Graham-Howard, Beth Henry, and summaries of minor's behavior while at juvenile hall.

In addition to his testimony at the hearing, Probation Officer Castro, in his report, noted minor was a known gang member who had access to firearms and the ability to summon fellow gang members when he needed their help, as minor did in this case. Minor had a history of possessing firearms. In fact, he used a firearm in the charged offense and then successfully concealed it; officers never found the weapons used in this offense. Officer Castro also noted that the current offense was an ambush where minor planned the attack with the assistance of a fellow gang member—intentionally causing harm to the victim, leading to his death. In the officer's opinion, the organization and planning of the assault involved "an extremely high level of sophistication." In addition, the officer observed that had minor feared for his safety, he had other alternatives to help him feel safe without shooting someone else.

Moreover, both Beth Henry and Dr. Graham-Howard discussed minor's childhood—including his mother's drug abuse and domestic violence in the home. Both of them discussed that minor suffered from PTSD due to his childhood and from witnessing Leonardo get shot. Henry noted that minor's family upbringing made minor feel rejected, insecure, and have low self-esteem and self-worth. Henry also reported that

17

minor stated he was "consumed by fear" at the time of the murder. Henry expressly stated that minor's past "clearly impacted his decision making and ability to control his impulsive behavior." Moreover, Dr. Graham-Howard opined that the current crime was criminally sophisticated because it included the use of weapons, multiple participants, efforts to avoid apprehension, and efforts to get rid of the evidence.

While making its finding the court acknowledged, "[a]t the time [minor] committed the current offense, he was 16 years old. The Court reviewed the evidence regarding [minor]'s maturity, intellectual capacity, mental and emotional health at the time of the offense." The court then noted Dr. Graham-Howard's testing, which showed minor was functioning at an average range of intelligence, and that minor "endured symptoms of depression and anxiety and meets the criteria for diagnosis of depression and [PTSD]." The court, however, clearly stated "that these factors did not mitigate the criminal sophistication exhibited by [minor]." Thereafter, the court discussed in detail minor's actions on social media, conversations regarding the murder investigation, and statements regarding his state of mind after the shooting of the victim, and found that minor "appreciated the risk and consequences of his criminal behavior." Additionally, the court noted minor's active gang membership, access to and the sale of firearms—even while on probation, and possession of a semiautomatic pistol during the time of the shooting. Furthermore, the court noted that during the chase, minor called Bradford to coordinate a plan, then directed Isaac to a location where Bradford showed up with a firearm, where they both shot at the victim's vehicle from different angles. Then, after the shooting, minor "direct[ed] the other individual to the location where the firearms

18

used in the shooting are concealed." The court recognized that Dr. Graham-Howard and Probation Officer Castro both opined minor exhibited a high level of criminal sophistication based on all the evidence presented in this case. Therefore, the court found under the criminal-sophistication criterion that minor was "not considered to be suitable to be dealt with under juvenile law, court law."

On appeal, minor agrees the facts of the crime, taken in isolation, demonstrate criminal sophistication and that "there was substantial evidence to support the court's factual findings." Minor, however, claims that the court abused its discretion because "[t]he court failed to properly account for the impact of minor's youth, childhood trauma and [PTSD] on the minor's decision-making process when the court evaluated minor's criminal sophistication."

We disagree with minor. Here, the juvenile court carefully and thoughtfully considered minor's personal circumstances and age. The court was well aware of the detailed evidence in this case. The court indicated that it had considered all the reports filed and evidence presented in this case. The mitigating factors regarding minor's background were thoroughly detailed in the evidence and acknowledged by the court. There is nothing in the record to suggest that the "court here erroneously treated the factors as irrelevant and therefore did not properly take them into account," as minor suggests. On the contrary, the court noted that "[a]t the time [minor] committed the current offense, he was 16 years old. The Court reviewed the evidence regarding [minor]'s maturity, intellectual capacity, mental and emotional health at the time of the offense." After considering the totality of the evidence, the court exercised its discretion

19

and concluded that the ambush aspect of the murder, minor's repeated possession and sale of firearms even while on probation, and his active membership in a criminal street gang reflected criminal sophistication that was not mitigated by his personal circumstances.

Based on the juvenile court's careful and thoughtful consideration of the evidence in this case, we agree with the court's finding of criminal sophistication and discern no abuse of discretion by the court.

### 2. THE VICTIM'S CONDUCT DID NOT MITIGATE THE GRAVITY OF THE OFFENSE

Next, minor contends that the juvenile court erred in finding that the gravity of the offense rendered him unfit for juvenile court. We disagree.

The gravity criterion focuses on the offense " 'alleged in the petition' " (*D.W. v. Superior Court*, *supra*, 43 Cal.App.5th at p. 119), and like the other statutory criteria, it is "based on the premise that the minor did, in fact, commit the offense." (*Jones*, *supra*, 18 Cal.4th at p. 682.) However, the allegation that a minor committed a serious offense, including murder, does not "automatically require a finding of unfitness." (*Ibid.*; *J.N.*, *supra*, 23 Cal.App.5th at p. 724.) In evaluating this criterion, a juvenile court may rely on evidence that, "while not justifying or excusing the crime, tends to lessen its magnitude," (*Jones*, at p. 685), "including, but not limited to, the actual behavior of the person, the mental state of the person, the person's degree of involvement in the crime, the level of harm actually caused by the person, and the person's mental and emotional development." (§ 707, subd. (a)(3)(E)(ii).)

20

First, minor claims that the court erred by evaluating this factor based on whether a jury could conclude minor was guilty of murder.

Here, as provided *ante*, the court expressly acknowledged the evidence presented at the hearing as to this factor required the court to resolve whether the victim's actions in pursuing minor and his cohorts lessened the gravity of the offense. The court stated: "The victim's high speed pursuit created a situation where [minor]'s state of mind is relevant in evaluating his conduct." The court then stated:

"The victim's conduct of pursuing [minor] over a period of time created fear and apprehension in [minor] as to the victim's intention; however, the Court believes [the] trier of fact could potentially infer from the circumstances surrounding the pursuit and shooting that [minor] did not view the threat posed by the victim as so imminent that he didn't have sufficient time to lead the victim to a location where a co-participant was waiting.

"The victim's conduct initiated the incident; however, his car pursuit of [minor] must be evaluated as part of the entire incident, including [minor]'s state of mind and his participation in shooting at the victim with a co-participant.

"Clearly the circumstances of shooting raises issues for the trier of fact regarding [minor]'s state of mind, self defense, and conspiracy with a co-participant to commit murder while lying in wait.

"The Court believes the victim's conduct does not mitigate the extreme seriousness in the high gravity of the offense; therefore under this criterion, [minor] is not considered to be suitable to be dealt with under juvenile court law."

Based on the court's statement minor argues that the court misunderstood that it was required to find, by a preponderance of the evidence, that minor was not fit for the juvenile court system. Instead, the court improperly focused on the fact that a trier of fact could find minor guilty of murder.

We disagree with minor's assessment of the juvenile court's statement. The court in this case acknowledged that the issue of minor's mental state and claim of self-defense were factors that had to be considered at an eventual trial as to minor's guilt. The juvenile court did not rely on the fact that a trier of fact might ultimately find minor guilty as the reason the court was finding minor unsuitable for juvenile court under this criterion. Instead, the court observed there were facts that could potentially be viewed as mitigating the gravity of the offense; for example, the victim initiated the incident and pursued minor and his cohorts at a high rate of speed. After observing these potentially mitigating factors, the court ultimately concluded that the victim's conduct did not mitigate the gravity of the offense, regardless of what an eventual trier of fact may conclude.

Moreover, minor contends that the court erred in finding that the murder could not be mitigated if he was not in imminent fear of harm. Minor relies on the court's statement that the victim's conduct resulted in minor feeling afraid and a trier of fact may conclude that minor did not view the conduct as an imminent threat of harm. Minor then goes on to argue an imminent threat of harm is not a requirement to reduce or justify a charge of murder, but rather sufficient provocation can reduce murder to manslaughter. Therefore, minor claims that because the juvenile court made a factual finding that minor

22

was afraid, which necessarily supported a heat-of-passion defense, the court's subsequent finding that the victim's behavior did not mitigate the gravity of the offense was an abuse of discretion.

Again, we disagree with minor's assessment of the trial court's ruling. When making its ruling, the juvenile court confirmed that it understood it was entitled to rely on evidence that lessened the gravity of the crime, even if it did not justify or excuse it. Thereafter, the court expressly acknowledged that the evidence showed the victim initiated a high-speed pursuit and minor was afraid. The court's statement that minor experienced fear did not automatically require the court to find that the fear mitigated the gravity of the offense. Here, the court made no factual finding that the fear minor experienced was sufficient to lessen the gravity of his offense. Instead, the court made an express finding to the contrary: "The Court believes the victim's conduct does not mitigate the extreme seriousness in the high gravity of the offense."

Here, during the high-speed chase, minor called Bradford. Together, they planned to meet at a specific location. Thereafter, minor directed Isaac to drive to that location. Eventually, they saw Bradford—and when the victim appeared—both minor and Bradford fired at the victim's vehicle from different angles. Thereafter, minor directed Isaac to flee the scene and take him to minor's residence, where minor disposed of the weapons. The evidence in this case clearly demonstrated minor's egregious conduct that led to the victim's murder. Therefore, we find that substantial evidence supports the court's finding that the victim's conduct did not mitigate the gravity of the offense.

In sum, substantial evidence supports the juvenile court's findings that (1) minor exhibited a degree of criminal sophistication; (2) minor's previous attempts at rehabilitation were unsuccessful; and (3) the victim's conduct did not mitigate the gravity of minor's offense. Moreover, we find that the court thoughtfully and carefully considered and weighed all the evidence in making its ruling on the motion to transfer the matter to adult criminal court. We discern no abuse of discretion by the trial court; the court was neither arbitrary nor capricious in making its determinations. Therefore, we affirm the court's order transferring minor's case to adult criminal court.

## DISPOSITION

The juvenile court's order transferring minor's case to adult criminal court is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER_____
Acting P. J.

We concur:

SLOUGH_____
J.

MENETREZ_____
J.